MANATT, PHELPS & PHILLIPS, LLP
CARL L. GRUMER (Bar No. CA 066045)
HARVEY L. ROCHMAN (Bar No. CA 162751)
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

Attorneys for Lessor
Thermo Grand Avenue, LLC

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>BROCKMAN BUILDING LOFTS, LLC,<br><br>Debtor. | Case No. 1:09-13713-KT<br><br>Chapter Number: 7<br><br>**OPPOSITION OF LESSOR THERMO GRAND AVENUE, LLC TO MOTION TO ASSUME AND ASSIGN PARKING LOT LEASE**<br><br>Date: October 13, 2009<br>Time: 11:00 a.m.<br>Place: Courtroom of the<br>Honorable Kathleen Thompson |

Thermo Grand Avenue, LLC ("Thermo Grand"), the Lessor under the Lease Agreement ("Parking Lot Lease" or "Lease") which is the subject of this Motion, hereby opposes the Trustee's Motion to Assume and Assign the lease as follows:

## INTRODUCTION

The Trustee's Motion to Assume and Assign the Parking Lot Lease ("Motion") leaves a lot of unanswered questions. First and foremost is why the Trustee is bringing this Motion at all. Nowhere does the Motion disclose what benefit the estate could possibly derive from the assumption and assignment of this Lease, and this entire Motion appears to be pursued for the sole benefit of a secured creditor. This is not a proper use of the bankruptcy law and of

the Trustee's powers, and for that reason alone, the Motion should be denied.

The second unanswered question is exactly who the Assignee will be. Strangely, the proposed Assignee is not even identified in the Motion. Apparently, it will be either some unspecified affiliate of Bank of America, or some newly formed (or to be newly formed) affiliate, whose financial and operational capabilities remain a mystery. The Trustee has made no showing whatsoever of the ability of the Assignee (whoever it might be) to comply with the provisions of the Lease on a going-forward basis, let alone a showing sufficient to rise to the level of adequate assurance of future performance. This provides the Court with yet another independent ground to deny the Motion.

As shown below the Lease does not even exist, having been terminated years ago due to the Debtor's violation of the use restrictions. The Court does not need to reach that issue, however, since this motion should not go forward regardless.

## I.
## THIS MOTION IS A MISUSE OF THE BANKRUPTCY LAW.

Section 365 of the Bankruptcy Code allows a Trustee to assume and assign an unexpired lease of the debtor. The purpose of this provision is to benefit the estate. *In re: G-N Partners* 48 B.R. 462, 465 (Bankr., D. Minn. 1985); *In re Norquist* 43 B.R. 224, 225 (Bankr., E.D. Wa. 1984). Section 365 allows the Estate to preserve a valuable asset, giving the Estate the opportunity to cure any defaults under the lease so that the Estate can derive an economic benefit that will enhance payment to creditors. But this Motion does nothing of the kind.

Rather, this Motion simply benefits a third-party, Bank of America ("Bank"), in its dispute with Thermo Grand. By this Motion, the Trustee seeks to exercise the powers granted by the Bankruptcy Code to override certain provisions in the Parking Lot Lease (i.e., consent requirement for assignment (§11.1) and *ipso facto* clause (§13.1 (e)), all perfectly enforceable under state law. But the trustee does not do so to create any benefit to the Estate or creditors. One may search the Motion in vain for any indication that the Estate would obtain any material benefit should the Court grant this Motion.[1] The Motion concedes that there is no "carve out" for

---

[1] Nor would this Motion benefit the restaurant which is currently operating in the Brockman building, as the Motion seems to suggest (even if that were a relevant concern). By its terms, the parking provided by the Parking Lot Lease

creditors. Motion, Exhibit 1, p. 15. Instead, the Trustee brings this Motion so that Bank of America (or some embryonic affiliate) can reap the benefits of the Bankruptcy Code properly reserved to the Estate, so that Bank of America may circumvent state law and accomplish for its own benefit what it could not do outside of the bankruptcy context. In other words, the Trustee seeks to intervene in a two-party dispute, to misuse the Bankruptcy Code for the benefit of one side. The Court should not let itself be used in this manner.

The Courts have not hesitated to prevent abuses of the Bankruptcy Code, where the Code was being misused for private benefit and not for the benefit of creditors. See, e.g., *In re Integrated Telecom Express, Inc.* 384 F. 3d 108, 128-129 (3d Cir. 2004) (Filing of Chapter 11 for the purpose of obtaining the "landlord's cap" held to show a lack of good faith); *In re Gooding* 234 B.R. 157 (Bankr., M.D. Fl. 1999) (Filing of Bankruptcy for the purpose of obtaining advantage in two-party litigation held to constituted bad faith.

The case law specifically applies this principle to the assumption or rejection of executory contracts and unexpired leases. *In re Cardi Ventures, Inc.* 59 B.R. 18, 22-23 (Bankr., S.D.N.Y. 1985) (Filing of Chapter 11 to assume and assign unexpired lease in order to circumvent state law restrictions on use and assignment held to be bad faith.); *In re Southern California Sound Systems*, 69 B.R. 893, 900 (Bankr., S.D. Ca. 1987) (Filing Chapter 11 solely to reject executory contract held to be bad faith. Motion to reject denied.); *In re Liberate Technologies*, 314 B.R. 206, 217 (Bankr., N. D. Ca. 2004) (Bad faith to file bankruptcy petition to get better price for equity holders in sale of assets, when not necessary to protect creditors) *In re Waldron*, 785 F. 2d 936, 940-1 (11th Cir. 1986) (Filing of Chapter 13 case for sole purpose of rejecting real estate sale contract held to be bad faith); *In re Sammons*, 210 B.R. 197, 199 (Bankr., M.D. Florida 1997) (Chapter 7 filing by boxer held to be bad faith when filed simply to reject contract with promoter) While our situation is somewhat unique in that the Bankruptcy Code is being misused for the benefit of a third party, rather than for the debtor as is usually the case, that does not change the result. If anything, that fact makes this case even more compelling.

---

is solely for "private, non-public parking of motor vehicles by purchasers and owners of the units in the Project, their gratuitous licensees, invitees, and guests, and no others." (§§ 1.2(e), 4.1). The parking cannot be used by the restaurant, its employees or guests.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

It is clear from the moving papers that the singular purpose of this Motion is to benefit the Bank. This Motion arises out of a commitment made by the Trustee in the Agreement re Credit, Business Operations, and Parking Lot Lease, previously approved by this Court. That agreement contains several provisions which make it quite transparent that the Trustee is simply acting on behalf of the Bank.

For example, whether or not the Trustee will file a motion to assume the Lease is dictated solely by the Bank. *See* ¶ 12. The purported "loan" to the Trustee under the agreement is in reality nothing more than protective advances under the Bank's deed of trust, no different than if the Bank had gone to state court and had a receiver appointed. *See* ¶ 3. (All of bank's payments to the Trustee shall be part of the Bank's secured claim, and not administrative expenses.) Indeed, the "Trustee's Expenses of Administration" that the Bank agrees to fund expressly <u>excludes</u> any matter adverse to the Bank and the prosecution of any claims or causes of action against third parties. *See* ¶ 5.

In other words, the Bank agreed to advance funds to the Trustee simply to protect its own collateral, and not for the general benefit of the Estate. In short, creditors are getting nothing under the Bank's agreement with the Trustee. Although the Bank is funding administrative expenses, those are administrative expenses related solely to the Bank's collateral. Had the Trustee simply abandoned the building (the Trustee concedes that there is no equity), the administrative expenses that the Bank is paying would not exist. Other expenses, which might actually benefit creditors, such as avoiding actions, are expressly excluded. The Bank only agreed to pay its own expenses.

In essence, the arrangement between the Bank and the Trustee is more akin to a receivership or property management arrangement. Indeed, the Trustee herself has so described it. In an article in the <u>Los Angeles Downtown News</u>, May 15, 2009, a true and correct copy of which is attached hereto as Exhibit G, the Trustee accurately describes the situation:

> **"Trustees don't usually administer buildings when there's no equity,"** Goldman said. In a later email, referring to the $45 million debt, she added, "I do not believe that it would sell near that in this market."

Goldman has not removed herself as Trustee, the usual action in such cases, because "the bank is considering a scenario where I will be appointed to deal with certain things before they foreclose," such as **paying bills and maintaining security at the property, she said.** (emphasis added)

Certainly, the Trustee could simply have abandoned the property, allowing the Bank to seek its state court remedies. Instead, the Trustee entered into the present arrangement with the Bank. There may be nothing wrong with that arrangement, since it does not harm creditors. Creditors had nothing before, and they have nothing now. But that does not mean that the Trustee's unique powers under the Bankruptcy Code thereby become available for sale for the private benefit of one party. The Trustee's powers to assume and assign an unexpired lease should be exercised to increase the distribution for unsecured creditors, not to benefit a private party. If there will be no such distribution, there is no need for the Trustee to take this action. This Motion is simply a misuse of the Bankruptcy Code and should not be allowed.

## II.
## THE TRUSTEE HAS NOT MADE A SHOWING OF ADEQUATE ASSURANCE OF FUTURE PERFORMANCE.

In order to assign an executory contract or unexpired lease, the Trustee must provide adequate assurance of future performance by the assignee. Bankruptcy Code § 365(f)(2)(B). Here, the Trustee has made no showing of such adequate assurance. Indeed, the Trustee has not even tried.

As noted above, the Motion does not even identify who the assignee will be, or whether the assignee even yet exists. Accordingly, it would be impossible for the Trustee to demonstrate the ability of such an unknown entity to perform the Lease.

The Trustee's sole showing in this regard is a simple recitation on page 15 of the Motion as to what the Bank "intends" to do. Moreover, as insufficient as that statement is, the supporting evidence presented with the Motion does not even go that far. The Declaration of David Kegaries fails to support even the bare conclusions in the Motion. In his Declaration, at ¶ 5, Mr. Kegaries merely states that he has "recommended" to the credit administration of the Bank and has received "preliminary indications that I will receive formal approval" of certain transactions. Hardly a bold pronouncement. He then goes on to merely reiterate the intent of the

ultimate nominee (which may not even exist) to take certain actions. The authority of Mr. Kegaries to speak on behalf of an unknown entity, and the source of his knowledge of that entity's "intention," is not explained. In any event, intent does not equate with adequate assurance. The Motion does not even attempt to present evidence of the proposed assignee's capabilities, nor could it.

This is important, since the Parking Lot Lease has numerous obligations remaining on the part of the tenant. For example, the Lease provides that Lessee "shall improve the Premises at Lessee's sole cost and expense for Lessee's purposes as provided in this Agreement . . ." Lease Agreement, § 1.2(a). Of course, the tenant must pay the rent (§ 3) and the property taxes (§ 5), but is also required to maintain the Premises and any "paving, fences, traffic control devices, and other improvements that Lessee shall install thereon in clean, orderly, and good condition." (§6.1(a)) The tenant is obligated to pay for all utility services (¶ 6.2), and insurance (§ 10), and to indemnify Thermo Grand from any liability. (§ 8.) Importantly, the tenant must also obtain a final Certificate of Occupancy for the Project (§ 2.1), and must establish a Homeowner's Association, pursuant to applicable California law. (§ 1.2(a).) The Trustee has made no showing as to the assignee's ability to perform any of these obligations.

It should be noted that this is a long-term lease, lasting at least 50 years, and perhaps as long as 95 years. (§ 2.) The ability of the assignee to discharge its obligations under the Lease is thus of paramount importance. The Trustee's failure to carry her burden in this regard is therefore even more significant. Based upon that failure, as well, the Motion should be denied.

### III.
### IN THE ALTERNATIVE, THE LEASE AUTOMATICALLY TERMINATED DUE TO THE DEBTOR'S VIOLATION OF THE EXPRESS LIMITATIONS ON USE.

Even if assignment of the Lease were warranted, it would be a moot point. The Parking Lot Lease automatically terminated in 2006 due to the Debtor's violation of the express use restriction in the Lease. Specifically, Debtor violated Paragraph 4.1 of the Parking Lot Lease which expressly provides that a violation of the use restrictions will result in an "automatic" and "immediate" termination of the Lease. Therefore, there is nothing for the Trustee to assume and

assign. However, the Court need not even reach this issue because this Motion should be denied for the reasons identified in Sections I and II, above.

In 2006, the Debtor used the Premises for construction staging, storage of building materials and storage of hazardous waste without the permission of Thermo Grand. Declaration of Harvey L. Rochman ("Rochman Decl."), ¶5. The Debtor, which was constructing a building next to the Premises, refused to cease such uses or obtain the agreement of Thermo Grand. As a result, Thermo Grand was forced to institute an unlawful detainer action and have the Sheriff lock the Debtor out of the Premises. During the lock-out, storage of hazardous waste was discovered and the Debtor was required to dispose of the waste pursuant to hazardous materials laws.

Paragraph 4.1 of the Parking Lot Lease entitled "Use" provides as follows:

> ***Lessee shall use and occupy the Premises solely in accordance with paragraph 1.2(a)***, above, and for purposes ordinarily and customarily incidental thereto. ***Lessee's covenant to do so is an essential condition of this Agreement***, and ***failure by Lessee to adhere to this use restriction shall cause this Agreement***, exclusive of the clauses expressly stated to survive expiration or termination, **to *automatically and immediately terminate***. (emphasis added.)

Paragraph 1.2(a) of the Parking Lot Lease provides that the Premises shall be "***used exclusively for private, non-public parking of motor vehicles by purchasers and owners of the units in the Project***, their gratuitous licensees, invitees and guests, and no others (emphasis added)." Construction staging, including storage of building materials and hazardous waste was plainly <u>not</u> a permitted use under the Parking Lot Lease. Accordingly, under the express provisions of paragraph 4.1, the Parking Lot Lease "automatically and immediately" terminated.

As described in the Declaration of Harvey L. Rochman, these events occurred in 2006. The Debtor contended that it had occupied the Premises in accordance with a sublease from Central Parking, which had leased the property from Thermo Grand, rather than the Parking Lot Lease. That sublease was in itself unpermitted and resulted in the eviction of Central

Parking. However, that distinction is irrelevant to whether the Parking Lot Lease automatically terminated because the "Use" restrictions in the Parking Lot Lease unequivocally apply to any use by Debtor [Lessee]. It is undisputed that the Debtor violated the "Use" restrictions in the Lease; therefore, the Lease terminated.

The "Use" restrictions and resulting termination of the Lease are enforceable under California law, and the Debtor's violation thereof resulted in a termination of the Lease. *Grant v. Aerodraulics Co.*, 91 C.A.2d 68, 75 (1949)("To 'terminate' a contract ... means to abrogate so much of it as remains unperformed, thereby doing away with the existing agreement upon the terms and with the consequences agreed upon"); *Sanborn v. Ballanfonte*, 98 Cal.App. 482, 488 (1929) (" 'Termination' or 'cancellation' of a conditional contract means to abrogate so much of it as remains unperformed, ... doing away with an existing agreement upon the terms and with the consequences mentioned in the writing, and different from 'rescission' which means to restore the parties to their former position.") Here, the provisions of the Parking Lot Lease are clear – violation of the use restriction (which cannot be disputed) resulted in immediate termination of the Lease.

## IV.
## THE LEASE IS IN DEFAULT.

Even if the Trustee were able to assume this lease, she would be required to cure all defaults under the Lease. As set forth in the attached Declaration of Harvey Rochman, there have been numerous defaults under the lease. Pursuant to Bankruptcy Code § 365(b)(1)(A), the Trustee must cure all defaults, to the extent (if any) that assumption is allowed. The Motion does not propose to do that.

## V.
## IF THE COURT SHOULD GRANT THE MOTION, THE COURT SHOULD NOT WAIVE THE STAY.

Although it perhaps is a moot point at this time, the Motion still requests that the Court waive the 10-day stay period under Federal Bankruptcy Procedure 6006(d). The rationale for that request when the Motion was originally made was due to the proximity between the date of the hearing and the deadline for the Trustee to assume the lease. After some stipulated

8

continuances and extensions, that deadline has now been extended to November 17, 2009, over a month after the scheduled hearing on this Motion. There is therefore no longer any reason for the 10-day stay to be waived.

## VI.
## CONCLUSION

For all of the foregoing reasons, the Motion should be denied. The Trustee's office is not for sale, and is not for the benefit of private litigants.

Dated: September 29, 2009     MANATT, PHELPS & PHILLIPS, LLP
Carl L. Grumer

By: /s/ Carl Grumer
Carl L. Grumer
*Attorneys for Lessor*
THERMO GRAND AVENUE, LLC

# DECLARATION OF HARVEY L. ROCHMAN

I, Harvey L. Rochman, declare as follows:

1. I am an attorney at law duly licensed to practice before all of the courts of the State of California and I am a partner with the law firm of Manatt, Phelps & Phillips, LLP, attorneys for Thermo Grand Avenue, LLC. I have personal knowledge of the facts set forth below and if called upon to testify, I could and would competently do so as follows:

2. A true and correct copy the Lease Agreement (Residential Parking Usage Only) (the "Parking Lot Lease" or the "Lease") is attached hereto as **Exhibit A**.

3. Section 1.2(a) of the Lease provides as follows:

> *[T]he Premises shall be . . . used exclusively for private, non-public parking of motor vehicles* by purchasers and owners of the units in the Project, their gratuitous licensees, invitees and guests, and no others. (emphasis added.)

4. Section 4.1 of the Lease provides as follows:

> *Lessee shall use and occupy the Premises solely in accordance with paragraph 1.2(a)*, above, and for purposes ordinarily and customarily incidental thereto. *Lessee's covenant to do so is an essential condition of this Agreement*, and *failure by Lessee to adhere to this use restriction shall cause this Agreement*, exclusive of the clauses expressly stated to survive expiration or termination, *to automatically and immediately terminate*. (emphasis added.)

5. In 2006, the Debtor violated the express use restriction in the Lease by using the leased Premises for construction staging, storage of building materials and storage of hazardous waste without the permission of Thermo Grand. Copies of some of the photographs of the Debtor's use of the Premises that I took at various times in 2006 are attached hereto as **Exhibit B**. At the time, the Debtor was constructing or renovating the Brockman Building which abuts the Premises on one side.

6. At the time, the Debtor contended that it occupied the Premises in accordance with a sublease from Central Parking System, Inc., which had leased the property from Thermo Grand rather than pursuant to the Parking Lot Lease. Central Parking's sublease to the Brockman was not permitted, and I filed an unlawful detainer action on behalf of Thermo Grand against Central Parking. After a trial, which I attended, Central Parking's lease was

terminated on May 15, 2006. However, the Debtor remained on the Premises and refused to cease its use in violation of the Parking Lot Lease.

7. Accordingly, Thermo Grand instituted an unlawful detainer action against the Debtor in October 2006. A true and correct copy of the complaint filed against the Debtor is attached hereto as **Exhibit C**.

8. On November 14, 2006, I met with counsel for the Debtor in regard to the Debtor's unpermitted use of the Premises, the violation of Section 4.1 of the Lease and the unlawful detainer proceeding. On November 24, 2006, I sent counsel for the Debtor a letter reiterating the Brockman's unlawful occupancy of the Premises and demanding that the Debtor cease using the Premises immediately. A true and correct copy of my letter dated November 24, 2006 is attached hereto as **Exhibit D**. As described below, the Debtor was ultimately dispossessed, pursuant to the unlawful detainer action which I filed against Central Parking, and the action against the Debtor (Exhibit C) was dismissed as moot.

9. On December 5, 2006, in my presence, the Debtor was locked-out of the Premises by the Los Angeles County Sheriff. At that time, I discovered a large open container containing hazardous waste on the Premises. The next day I sent an e-mail, a true and correct copy of which is attached hereto as **Exhibit E**, to counsel for the Debtor. A photograph that I took of the hazardous waste found on the Premises at the time of the lock-out is included in the photographs attached as Exhibit B.

10. Attached hereto as **Exhibit F** is a true and correct copy of an article from the Los Angeles Downtown News published on May 15, 2009, which I obtained from an internet search of articles regarding the Brockman Building.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 29th day of September 2009 in Los Angeles, California.

HARVEY L. ROCHMAN