1  Kenneth N. Russak (State Bar No. 107283)
   Laine Mervis (State Bar No. 223235)
2  Michael J. Gomez (State Bar No. 251571)
   FRANDZEL ROBINS BLOOM & CSATO, L.C.
3  6500 Wilshire Boulevard
   Seventeenth Floor
4  Los Angeles, California 90048-4920
   Telephone: (323) 852-1000
5  Facsimile: (323) 651-2577

6  Attorneys for Bank of America, N.A.,
   successor by merger to Countrywide Bank, FSB

7

8

9            UNITED STATES BANKRUPTCY COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11            SAN FERNANDO VALLEY DIVISION

12  In re                          CASE No. 1:09-13713-KT

13  BROCKMAN BUILDING LOFTS, LLC,   Chapter 7

14        Debtor.                   Hon. Kathleen Thompson

15                                  **BANK OF AMERICA, N.A.'S:**

16                                  **(1) JOINDER IN SUPPORT OF CHAPTER
                                    7 TRUSTEE'S MOTION TO ASSUME
17                                  AND ASSIGN PARKING LOT LEASE;**

18                                  **(2) REPLY TO OPPOSITION OF LESSOR
                                    THERMO GRAND AVENUE, LLC**
19

20                                  DATE:  October 13, 2009
                                    TIME:  11:00 a.m.
21                                  CTRM:  301

22

23

24

25

26

27

28

   634317.5 | 100298-0002                    1

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................... 2

II.     ............................................................................................................................ 4
SUMMARY .........................................................................................OF FACTS
       A.   Background Facts Relating to the Lease Between Brockman and Thermo
            Grand ................................................................................................................ 4
       B.   The Master Lease Between Thermo Grand and Central Parking; the
            Sublease Between Central Parking and the Debtor; and the Subsequent
            Litigation ......................................................................................................... 7
       C.   Thermo Grand Enforces Its Judgment Against the Debtor ......................... 8
       D.   Bank of America (Through Its Predecessor) Replaces Prior Construction
            Lender ................................................................................................................. 9
       E.   Creditors and the Public Have a Significant Stake in the Success of the
            Motion ............................................................................................................... 10

III.    ARGUMENT ................................................................................................. 11
       A.   Assumption And Assignment Is Reasonable And Appropriate To Preserve
            Value Of The Estate ....................................................................................... 11
       B.   More Than Adequate Assurance Of Future Performance Exists To Grant
            The Relief Requested In The Motion ........................................................... 15
       C.   The Parking Lot Lease Continues In Effect, And Thermo Grand Must
            Abide By The Bargain It Struck .................................................................... 16
            1.   Thermo Grand Confuses Two Separate Lease Agreements -- No
                 Termination Has Been Effective As To The Brockman Lease ................. 16
            2.   No Breach Occurred According To The Terms Of The Parking Lot
                 Lease ............................................................................................................ 16
            3.   Thermo Grand's Own Actions Demonstrate No Breach Occurred ............. 17
            4.   Even In The Event Of A Breach, The Brockman Lease Is Not
                 Terminated And Continues In Effect ......................................................... 18
       D.   The Motion Appropriately Provides For The Curing Of Any Defaults. ................. 19

IV.    CONCLUSION ................................................................................................. 20

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Page(s)

**FEDERAL CASES**

In re Cardi Ventures, Inc.
    59 B.R. 18 (Bankr. S.D.N.Y. 1985) .................................................................. 14

In re Liberate Techs.
    314 B.R. 206 (Bankr. N.D. Cal. 2004) .............................................................. 14

In re S. Cal. Sound Sys., Inc.
    69 B.R. 893 (Bankr. S.D. Cal. 1987) ................................................................ 14

In re Sammons
    210 B.R. 197 (Bankr. M.D. Fla. 1997) .............................................................. 14

In re Waldron
    785 F.2d 936 (11th Cir. 1986) .......................................................................... 14

In re W. Pac. Airlines
    218 BR 590 (Bankr. D. Colo. 1998) ................................................................. 12

In re Windmill Farms, Inc.
    841 F.2d 1467 (9th Cir. 1988) .......................................................................... 19

U.S. Trustee v. GPA Technical Consultants, Inc.
    106 B.R. 139 (Bankr. S.D. Ohio 1989) ............................................................ 12

Wilson v. Bill Barry Enters., Inc.
    822 F.2d 859 (9th Cir. 1987) ............................................................................ 19

**CALIFORNIA CASES**

Boston Props. v. Pirelli Tire Corp.
    134 Cal.App.3d 985 (1982) ............................................................................... 19

Hignell v. Gebala
    90 Cal.App.2d 61 (1949) ................................................................................... 19

Igauye v. Howard
    114 Cal.App.2d 122 (1952) ............................................................................... 18

Mossi v. Fairbank
    19 Cal.App. 355 (1912) ..................................................................................... 18

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Salton Community Servs. Dist. v. Southard
    256 Cal.App.2d 526 (1967) ................................................................................ 18

Schnittger v. Rose
    139 Cal. 656 (1903) ......................................................................................... 19

Strom v. Union Oil Co.
    88 Cal.App.2d 78 (1948) .................................................................................. 19


**FEDERAL STATUTES**

11 U.S.C. § 365(e)(1)(B) .................................................................................... 14

11 U.S.C. § 364(d)(1) ......................................................................................... 13

11 U.S.C. § 365 ........................................................................................... 11, 14

11 U.S.C. § 365(b)(1)(A) .................................................................................... 19

11 U.S.C. § 365(f)(2)(B) ..................................................................................... 14

11 U.S.C. § 503(c) .............................................................................................. 13

11 U.S.C. § 1112(b) ........................................................................................... 14


**CALIFORNIA STATUTES**

California Code of Civil Procedure § 1179 ....................................................... 19


**OTHER AUTHORITIES**

Cal.Jurd.3d, Landlord And Tenant, § 305 (West 2008) .................................... 18

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   Bank of America, N.A., successor by merger to Countrywide Bank, FSB ("Bank of

2   America"), joins in the "Motion of Trustee for Order: (1) Authorizing the Trustee to Assume and

3   Assign Parking Lot Lease, etc." (the "Motion") filed by Amy L. Goldman, the Chapter 7 Trustee

4   ("Trustee") for Brockman Building Lofts, LLC (the "Debtor"), and further replies to the opposition

5   (the "Opposition") filed by Thermo Grand Avenue, LLC ("Thermo Grand"), as follows.

6                                           I.

7                                    **INTRODUCTION**

8           This case was commenced on April 1, 2009 with the filing of a voluntary chapter 7 petition

9   by the Debtor, a real estate development entity that owns the "Brockman Building" in downtown

10  Los Angeles. Pursuant to an order of this Court ("Operating and Funding Order") filed and

11  entered on July 15, 2009, the Trustee has been operating the business and property of the Debtor,

12  using funds it has been authorized to borrow from Bank of America under a $350,000 funding

13  agreement. As a result, a nascent but nonetheless remarkable revitalization of a formerly bleak

14  area of downtown Los Angeles is gaining strength. But that revitalization needs the additional

15  support of this Court to continue. The common economic interests of Bank of America, of the

16  newly opened "Bottega Louie" Restaurant and of the public at large in the success of the

17  enterprises located at the Brockman Building will be significantly impaired if Thermo Grand is

18  permitted to renege on a promise to provide 51 parking spaces for future residents of the

19  Brockman Building. These mere 51 spaces are to be located in an adjacent and enormous black-

20  top parking lot on which Thermo Grand operates a daily for-fee parking lot, open to the public.

21  The 50 parking spaces are a "drop in the bucket" to Thermo Grand, but they are the life blood of

22  the Brockman Building.

23          Thermo Grand spills much ink impugning the motives of the Trustee—and of necessity

24  impugning either the wisdom or motives of this Court and the Office of the United States Trustee

25  in approving the Trustee's approach to this case as embodied in the Operating and Funding Order.

26  Thermo Grand, however, does not explain its own motives at all. No doubt, it wants to escape the

27  bargained for exchange it willingly entered into before it was sold to a well-known downtown

28  developer named Sonny Astani. Thermo Grand's prior owners supported the Debtor's enterprise;

634317.5 | 100298-0002

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

but Mr. Astani apparently sees an opportunity to gain an advantage over a competing downtown development. He wants to either cut-off or ransom the lifeblood of any residential project: convenient parking.

This Court, however, need not probe motives to overrule Thermo Grand's objection. Its objections are unsupported by the facts or the law for, among others, the following reasons:

1.    <u>This case is not being prosecuted in bad faith</u>. No doubt, the private interests of the restaurant and of Bank of America are at stake in these proceedings, but public policy objectives embodied in the Bankruptcy Code have motivated the Trustee's approach to this case, and the approval of that approach by this Court and by the OUST. Bank of America, for its part lauds the recognition of these objectives, as it has an obvious stake not only in the success of the Brockman Building, but also in the economic vitality of all of the communities in which it does business.

2.    <u>The Brockman Parking Lease Remains in Full Force and Effect</u>. The only lease ever terminated by Thermo Grand was a master parking lease between Thermo Grand and Central Parking, an entity which previously operated the massive adjacent parking lot. The Debtor's use of a portion of that lot for construction staging was a sublease under the master lease.

3.    <u>There is more than sufficient adequate assurance of future performance under the lease</u>. As demonstrated in declarations submitted with the Trustee's moving papers and attached hereto, Bank of America has developed a serious, feasible well structured set of transactions designed to put the parties into the same position that they would have been in if the Debtor's development had been successful. The Brockman Building will be owned by a single purpose entity, fully entitled to operate as a residential project with entitlements and an owners' association in place to act as the lessee under the Brockman Lease.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

## II.

## SUMMARY OF FACTS

A.   **Background Facts Relating to the Lease Between Brockman and Thermo Grand**

Until December 4, 2003, the Brockman Building was owned by Thermo Grand LLC, a Colorado limited liability company ("Thermo-Colorado") and the predecessor of Thermo Grand.[1] The building is located on the northern-most corner of a very large city block located in downtown Los Angeles, bounded by 7th and 8th Streets to the north and south, and Olive Street and Grand Avenue on the east and west.

In the graphic below, the Brockman Building is the large building at the top corner of the block. The remainder of the block (but for a building at the eastern-most corner not involved in these proceedings) is a very large black-top parking lot owned by Thermo Grand, the northern section of which (roughly depicted in green below, hereinafter the "Brockman Parking Area") will be the exclusive parking area for the Brockman Building once construction is completed and a final Certificate of Occupancy is obtained.

---

[1] Thermo Grand does not identify the chartering state of its formation. Public records indicate an entity owned or controlled by a well-known Los Angeles developer named Sonny Astani acquired Thermo-Colorado in a reverse merger transaction during 2005. The transaction cancelled the equity interests of the former owners, leaving Astani the sole owner. Hereafter, we refer to "Thermo-Colorado" as the entity prior to its acquisition by Astani and "Thermo Grand" thereafter. See Request for Judicial Notice, Exs. 1-4 (authenticated in Pang Decl.).

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Brockman Building Graphic[2]



Brockman Building

Brockman Parking Area

Parking Lot

On December 4, 2003, Thermo-Colorado sold the Brockman Building to the Debtor and simultaneously entered into the Brockman Lease, providing for the future lease of 51 parking spaces (the "Brockman Parking Area").[3] The Brockman Lease *expressly contemplated extensive construction activities related to the Brockman Building and mandatory construction of improvements to the Brockman Parking Area itself.* Section 1.2(a) of the Brockman Lease,

---

[2] The image is a map obtained from Google Maps, which has been edited by counsel to crop the borders of the image and to add the shading and external labels to identify the parking areas and the location of the Brockman Building. The URL for the Google map before editing was:

> http://maps.google.com/maps?f=q&source=s_q&hl=en&geocode=&q=700+South+Grand+Avenue+Los+Angeles,+CA+90017&sll=34.04737,-118.256578&sspn=0.003725,0.009624&ie=UTF8&hq=&hnear=700+S+Grand+Ave,+Los+Angeles,+California+90017&ll=34.04609,-118.256418&spn=0.001862,0.004812&t=h&z=18&pw=2

[3] Section 1.2(b) of the lease between Thermo Grand and the Debtor reserved the right of the landlord to relocate the Brockman Parking Area, should the landlord elect to redevelop the larger parking lot. Opp., Ex. A.

REPLY AND JOINDER IN SUPPORT OF CHAPTER 7 TRUSTEE'S MOTION
TO ASSUME AND ASSIGN PARKING LOT LEASE

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1 partially quoted by Thermo Grand, makes this clear:

> 1.2(a)　　　　Lessor has conveyed the Brockman Parcel to lessee by Grant Deed of even date. ***Lessee intends to redevelop the Brockman Parcel for approximately eighty-eight (88) live/work condominium units*** (the "**Project**"). ***Lessee shall assign*** its rights under this Agreement ***to an owners association which will be established*** pursuant to applicable law in conjunction with the Project, ***upon the express condition that the Premises*** [the Brockman Parking Area] ***shall be*** included in the common area of the Project and be ***used exclusively for*** private, non-public parking of motor vehicles by purchasers and owners of the units in the Project, their gratuitous licensees, invitees and guests, and no others. In connection with assignment of this Agreement, the owners association must expressly assume all of Lessee's obligations hereunder. ***Lessee shall improve the Premises at Lessee's sole cost and expense for Lessee's purposes as provided in this Agreement***: provided, however, that all such Improvements shall be for surface parking only and no parking structure or deck of any nature shall be erected thereon by Lessee, its successors and assigns.

10 Opp., Ex. A, Brockman Lease (emphasis added.)

11 　　　　The "owners association" contemplated by the permitted uses section has not yet been

12 created. Motion, Kegaries Decl. ¶ 5 (p. 23, lns 4-6). There is no use provision in the lease which

13 speaks at all to use limitations enforceable prior to the creation of the owners association. Indeed,

14 the term of the Brockman Lease has not yet commenced. The Brockman Lease provides that

15 "[t]he term of this Agreement (together with extensions, if exercised, as hereinafter provided, the

16 "Term") shall commence on the first day of the month after Lessee receives a final Certificate of

17 Occupancy for the Project." Opp., Ex. A, § 2.1. When the Debtor filed for bankruptcy,

18 construction was nearly complete, but a variety of "punch-list" items must be completed before a

19 final Certificate of Occupancy can be obtained. *See* Stenson Decl. ¶ 5-8. Progress is being made

20 by the Trustee to complete those items and it is anticipated that a final Certificate of Occupancy

21 will be obtained in the next few months. *See* Id.

22 　　　　Furthermore, the Brockman Lease unmistakably contemplated construction activities in the

23 Brockman Building and any uses "ordinarily and customarily incidental" to the construction.

24 Referencing § 1.2(a), quoted immediately above, § 4.1 of the lease makes this abundantly clear:

> 4.1　　Lessee shall use and occupy the Premises solely in accordance with paragraph 1.2(a), above, and ***for purposes ordinarily and customarily incidental thereto…***

27 Opp., Ex. A (emphasis added). That section, quoted above, contemplates at least two different

28 sorts of construction activities: redevelopment of the Brockman Parcel and the improvement of the

634317.5 | 100298-0002

6

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   Brockman Parking Area itself.   The improvements contemplated included grading, paving and

2   painting of the very area that Thermo Grand asserts can only be used for the parking of cars owned

3   by residents of the Brockman Building.  It would have been impossible to achieve the purposes of

4   the Brockman Lease under such an illogical construction.  *See* Declaration of Norman J. Salter at

5   ¶ 11.

6   **B.      The Master Lease Between Thermo Grand and Central Parking; the Sublease**

7           **Between Central Parking and the Debtor; and the Subsequent Litigation**

8           At the time the Debtor acquired the Brockman Building, the remainder of the undeveloped

9   lot (including the Brockman Parking Area) was under a long-term lease between Thermo-

10  Colorado, as lessor, and Central Parking, as lessee (the "Central Parking Master Lease").  Thermo

11  Grand explained as much in its own Statement of Material Facts submitted in State court litigation

12  with Central Parking, and this is supported by the State court's Statement of Decision in that suit.

13  Request for Judicial Notice submitted concurrently with the Court ("RJN"), Ex 5, Thermo Grand

14  Statement of Material Facts in Support of Summary Judgment Motion, p.1, lns 11-19

15  (authenticated in Pang Decl.); RJN, Ex. 6, Los Angeles Superior Court Statement of Decision, p.1,

16  ln 26 – p. 2, ln 3) (authenticated in Pang Decl.).  Central Parking operated a public daily use

17  parking lot under the Central Parking-Thermo Lease.  RJN, Ex. 6, Superior Court Statement of

18  Decision, p.3, lns 4-6 (authenticated in Pang Decl.).  At that time (and still), the term of the

19  Brockman Lease had not commenced.  Thus, Central Parking possessed and controlled the

20  Brockman Parking Area by virtue of the Central Parking Master Lease.

21          During 2003 and 2004, when the Debtor began construction, Central Parking entered into a

22  *sublease* or like sub-tenancy ("Brockman Sublease") with the Debtor.  RJN, Ex. 6, Los Angeles

23  Superior Court Statement of Decision, p. 3, ln 28 – p. 4, ln 5 (authenticated in Pang Decl.).  ***This***

24  ***was done at the urging and with the consent of Thermo-Colorado***.  RJN, Ex. 7 (Costanzo Decl.,

25  Ex 15, Deposition of Jerry Skillet (p. 39, ln 11 – p. 41, ln 23) (authenticated in Pang Decl.).  The

26  Brockman Sublease granted a sub-tenancy to the Debtor of roughly the same area ("Subleased

27  Premises") as the Brockman Parking Area.  RJN, Ex. 6, Los Angeles Superior Court Statement of

28  Decision, p. 3, ln 28 – p. 4, ln 5 (authenticated in Pang Decl.).  The Brockman Sublease was

634317.5 | 100298-0002

7

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  obtained so that the borrower, contractors, subcontractors and suppliers providing labor or

2  materials to the project could have a place to park their cars, trucks, equipment and a trailer used

3  as a temporary office, and for other incidental purposes ordinarily and customarily associated with

4  similar projects. Salter Decl. ¶ 8.

5       Sometime in 2005, the principals of Thermo-Colorado sold Thermo-Colorado to an entity

6  owned or controlled by Sonny Astani in a transaction that created Thermo Grand. See fn. 1, supra.

7  Despite urging the Debtor to enter into the Brockman Sublease in order for the Debtor to

8  expeditiously complete construction, Thermo-Colorado did an about face. RJN, Ex. 7, (Costanzo

9  Decl., Ex 15, Deposition of Jerry Skillet (p. 39, ln 11 – p. 41, ln 23) (authenticated in Pang Decl.).

10  Now controlled by Astani, Thermo Grand contended Central Parking breached the Central Parking

11  Master Lease by entering into the Brockman Sublease and by renting the lot for construction

12  staging. RJN, Ex. 6, Los Angeles Superior Court Statement of Decision, p. 3, ln 28 – p. 4, ln 5

13  and p. 4, ln 15 - 18 (authenticated in Pang Decl.). Central Parking denied such uses constituted a

14  breach and litigation ensued (the "Central Parking Litigation"). The Central Parking Litigation

15  only adjudicated the claims and defenses arising between Central Parking and Thermo Grand

16  under the Central Parking Master Lease. The Debtor was not a party to the lawsuit. The

17  Brockman Lease was not at issue in the lawsuit. See, generally, id.

18       Ultimately, Thermo Grand won a judgment to evict Central Parking on June 16, 2006.

19  RJN, Ex. 8, Los Angeles Superior Court Judgment (authenticated in Pang Decl.). The judgment

20  contained the usual provisions in an unlawful detainer suit giving over possession of the property

21  from Central Parking and "all tenants, subtenants and other occupants." RJN, Ex 8, Los Angeles

22  Superior Court Judgment entered June 16, 2006, ¶ 2 (authenticated in Pang Decl.). While the

23  Debtor was not bound by the judgment directly, the judgment terminated Central Parking's right to

24  possession and therefore the Debtor's derivative right of possession under the Brockman Sublease.

25  The Debtor became a tenant at will.

26  **C.**    **Thermo Grand Enforces Its Judgment Against the Debtor**

27       Following the entry of judgment against Central Parking, the Debtor attempted to negotiate

28  a Construction Staging month to month tenancy directly with Thermo Grand. Salter Dec ¶ 10.

634317.5 | 100298-0002

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    Those negotiations were unsuccessful and eventually it became clear that the Debtor would either

2    have to vacate the subleased premises or engage in litigation with the Debtor. Indeed, on October

3    19, 2006, Thermo Grand commenced an unlawful detainer action against the Debtor (the

4    "Brockman Litigation"). Opp., Ex. C, Brockman Litigation Complaint (Bates Stamp 44). The

5    complaint, however, did not allege a breach of the Brockman Lease. Instead, the complaint

6    expressly alleged that the (incorrectly named) Debtor held possession under a "tenancy at will,"

7    not under a lease. See id. at ¶ 2(a) (Bates Stamp 46). The Brockman Lease was not incorporated

8    by reference or mentioned in the complaint. As admitted by Harvey Rochman, counsel for

9    Thermo Grand at Manatt, Phelps & Phillips, LLP, the Brockman Litigation was abandoned. Opp.,

10   Rochman Decl. ¶ 8, lns 11-13 (Bates Stamp 11). The Sheriff who locked parties out did so under

11   the judgment issued against Central Parking. Id. at lns 11-13 (Bates Stamp 11). Whether

12   voluntarily or under threat of process, however, the Debtor apparently departed the Subleased

13   Premises in late 2006. Salter Decl. ¶ 10. See Rochman Decl. ¶ 9 (Bates Stamp 11).

14   **D.      Bank of America (Through Its Predecessor) Replaces Prior Construction Lender**

15        Bank of America (through its predecessor-in-interest Countrywide Savings Bank, FSB)

16   was not the original construction lender. Bank of America made its loan on April 7, 2007, taking

17   out the outstanding balance owed to the prior construction lender (an unrelated financial

18   institution) and, in general, agreeing to fund remaining construction costs. Motion, Ex. 1, Bates

19   Stamp 108, ¶ A. Bank of America wished to encumber the Brockman Lease for additional

20   security for its loan. Gordon Decl. ¶ 2.

21        During loan negotiations, the Debtor presented Bank of America with a letter signed by

22   Astani on behalf of Thermo Grand dated February 7, 2006 in which Thermo Grand agreed to

23   execute a formal consent to encumbrance of the Brockman Lease by a construction Lender. Bank

24   of America requested the Debtor obtain Thermo Grand's signature on such a formal consent.

25   Loren Gordon, Bank of America's outside counsel, prepared a form for that purpose. Gordon

26   Decl. ¶ 3-4. The form was not executed and returned promptly. _Id._ Gordon eventually engaged

27   in direct communications with Rochman around May 1, 2007 to determine the cause of the delay

28   and negotiate any issues that Thermo Grand might have regarding the particulars of the form. _Id._

634317.5 | 100298-0002

9

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   at ¶ 5.

2        At no time during those communications did Rochman state, imply or otherwise

3   communicate to Gordon that he or Thermo Grand contended that the Brockman Lease was

4   terminated. *Id.* Instead, Rochman informed Gordon that while his client was out of the country,

5   he could not commit him to any particular position, but he informed Gordon to not interpret such

6   action as a sign that Astani was opposed to signing the form. Id.

7   **E.      Creditors and the Public Have a Significant Stake in the Success of the Motion**

8        While construction is nearly complete, the Project has not been a financial success.

9   Nineteen creditors other than Bank of America (primarily construction trade creditors) filed proofs

10  of claim totaling at least $4,283,757.06. That amount includes an unsecured claim for at least

11  $747,043.35 filed by BHFC Operating LLC ("Bottega Louie").[4] Bottega Louie operates the

12  restaurant in the ground floor of the Brockman Building and employs about 200 people. Motion,

13  Ex. 1, Bates Stamp 043.

14       Thermo Grand, for its part, does not appear to have any damages at all. It admits the

15  Debtor long ago ceased using the parking lot for construction staging. It submits no evidence of

16  any uncompensated damages resulting from the alleged breach. ***Thermo Grand has even filed a***

17  ***proof of claim.*** The claim bar date in this case was September 29, 2009.

18       Creditors in addition to Bank of America have a significant interest in the outcome of the

19  Motion. The Brockman Building is an old building with parking for no more than 50 cars in its

20  small, underground parking facility. Salter Decl. ¶ 3. It is likely that in the next few months the

21  property will be sold by foreclosure sale or in a section 363 sale. Afterwards, the property will be

22  transferred to an entity that will implement a marketing program to get residents into the units. If

23  the Brockman Building cannot offer safe and convenient parking to its residents, the marketing

24  effort will be jeopardized. Salter Decl. ¶ 3.

25       Bank of America is not the only party interested in avoiding such a disastrous outcome.

26

27       [4] The Bank has not examined the proofs of claim in any detail and reserves its rights with
    respect thereto.

28

634317.5 | 100298-0002

10

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1  Bottega Louie's business plan includes significant revenues from residents of the property.  Flores

2  Decl. ¶ 4 (p.2, ln 19 - p. 3, ln 2.  Insufficient parking options will delay or materially reduce

3  Bottega Louie's ability to implement the sales-to-building-residents aspect of its business plan.

4  There is also a significant public interest associated with the Project.  The article in the Los

5  Angeles Downtown News attached to the Rochman declaration includes the following quote from

6  Carol Schatz, the president of the Downtown Center Business Improvement District:

7  "It is unfortunate, because it is a beautiful building right in the heart of Downtown,"
   said Carol Schatz, president of the Downtown Center Business Improvement
8  District.  "This project has not been on time from any perspective.  it was supposed
   to have opened up four years ago, and if they had we wouldn't even be talking
9  about an empty building."

10  Opp., Ex. F.  Before the Trustee presented her Motion for Order Authorizing Trustee To: (1)

11  Operate Debtor's Business and Property, (2) Incur and Use Credit etc.", the Trustee carefully

12  consulted with the Office of the United States Trustee ("OUST").  See Motion, Ex. 1, Bates Stamp

13  036-037, lns 27-3; Motion, Ex. 1, Goldman Decl. ¶ 15 (Bates Stamp 046).  These consultations

14  included Bank of America's request to work with the Trustee to attempt to preserve value and jobs.

15  The OUST, apparently recognizing the public interest in supporting the economic viability of the

16  Brockman Building and Bottega Louie, approved of these efforts to preserve estate value and jobs.

17  **III.**

18  **ARGUMENT**

19  A.  **Assumption And Assignment Is Reasonable And Appropriate To Preserve Value Of**

20  **The Estate**

21  In its Opposition, Thermo Grand acknowledges Bankruptcy Code section 365 permits

22  assumption and assignment "to preserve a valuable asset" so that the estate can "derive an

23  economic benefit that will enhance payment to creditors."  Opp., p. 2, lns 17-19.  These are

24  precisely the facts here.  Redevelopment of the Brockman Building is close to completion, amid a

25  real estate downturn and economic crisis unmatched in years.  The prompt completion of the

26  building and the sale of the units will maximize the value of estate property and assist the recovery

27  of downtown Los Angeles' loft district.  The assignment of the Brockman Lease is essential to

28  maximize the building's value and the revival of the downtown loft district.  Thermo Grand's

634317.5 | 100298-0002

11

efforts to oppose assignment are calculated to depress the value of the estate's only asset . It

would also negatively impact Bottega Louie and its 200 employees.

    Furthermore, while unsecured creditors appear to be out-of-the-money, there are other

constituencies that stand to benefit from a successful case that enhances the going concern value

of the estate. Aside from Bank of America's secured claim (scheduled at $34.4 million), the

Debtor listed claims secured by mechanics liens totaling over $4.8 million. Motion, Ex. 1, Bates

Stamp 082-087. It is conceivable that there will be contests over the priority of these liens, or that

parties will seek to resolve potential litigation. In short, maximizing the value of the property can

only potentially increase payments to the estate's creditor base. Perhaps most significantly,

assumption and assignment of the Brockman Lease maintains precisely the prepetition bargain

struck between the Debtor and Thermo Grand.

Unhappy with the natural outcome of the facts and law here, Thermo Grand dons the "sheep's

clothing" of junior creditors, arguing assumption and assignment cannot provide any benefit

because unsecured creditors are out-of-the-money. It is not unheard of for unsecured creditors to

gamble the value of an estate, in an effort to obtain leverage or "hold-out" value for themselves.

But the present facts are well beyond such a typical case. While Thermo Grand claims to speak

for the downtrodden, in fact its Opposition is calculated to destroy the going concern value of the

building. It seeks only to benefit itself, to the detriment of the Debtor, Bank of America,

mechanics lien claimants, future condominium owners, and other constituencies. (Indeed, Thermo

Grand is scheduled as holding a claim in the amount of $0.00, and it has not asserted any claim

against the estate. Motion, Ex. 1, Bates Stamp 107.) At any rate, a number of Courts have

examined exactly this issue and have held that "[e]ven if the only reason for the Chapter 11 in the

instant case is to maximize the return to the secured creditor through the retention of the debtor-in-

possession to collect and liquidate assets and to avoid prepetition transfers of the debtor, the

interests of the secured creditor are legitimate interests to be taken into account in deciding

whether to convert or dismiss a Chapter 11 case." U.S. Trustee v. GPA Technical Consultants,

Inc., 106 B.R. 139, 142 (Bankr. S.D. Ohio 1989); see also In re W. Pac. Airlines, 218 BR 590,

591-92 (Bankr. D. Colo. 1998) ("Debtor-in-possession lenders and postpetition financiers depend

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

634317.5 | 100298-0002

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    on the Court and the integrity of the bankruptcy process to ensure that their rights are not ignored

2    or summarily disposed of by the Court …. As long as the debtor-in-possession lender acts

3    responsibly and in good faith, then the bankruptcy court should retain a forum for the lender to try

4    to protect its bargained-for rights and interests.").

5         Of course, Thermo Grand did not bring any motion to dismiss this case. Nor did it object

6    to appointment of the Trustee. Nor did it oppose the Trustee's motion seeking authority to operate

7    the Debtor's business and obtain postpetition financing, all of which expressly contemplated and

8    disclosed to the Court and parties-in-interest that the Trustee intended to assume and assign the

9    Brockman Lease to a nominee of Bank of America in connection with a foreclosure. Motion, Ex.

10   1, Bates Stamp 138. Instead, Thermo Grand filed an Opposition to assumption and assignment

11   attacking virtually every constituency in this case. In particular:

12        • Thermo Grand speaks a great deal to the motives of others. It not only asserts that

13   the Trustee's efforts will not create any economic benefit to the estate or creditors but, moreover,

14   *that the Trustee does not intend to do so*. Opp., p. 2, lns 19-20, 24-25 ("By this Motion …. trustee

15   does *not* do so to create any benefit to the Estate or creditors.") (emphasis in original); Opp., p. 3,

16   lns 1-3 ("Trustee brings this Motion so that Bank of America … can reap the benefits of the

17   Bankruptcy Code properly reserved to the Estate.")

18        • Thermo Grand apparently lumps this Court together with the conspirators it

19   chooses to see, stating:

20            It is clear from the moving papers that the singular purpose of this
             Motion is to benefit the Bank. ***This Motion arises out of a***
21           ***commitment made by the Trustee in the Agreement re Credit,***
             ***Business Operations, and Parking Lot Lease, previously approved***
22           ***by this Court. That agreement contains several provisions which***
             ***make it quite transparent that the Trustee is simply acting on***
23           ***behalf of the Bank***."

24   Opp., p. 4, lns 1-5 (emphasis added).

25        • Thermo Grand imagines conspiracies in the exercise of powers properly permitted

26   under the Bankruptcy Code. It complains: "the purported 'loan' to the Trustee … is in reality

27   nothing more than protective advances under the Bank's deed of trust." Opp., p. 4, lns 7-9.

28   Thermo Grand may be unfamiliar with Bankruptcy Code § 364(d)(1), permitting the incurrence of

634317.5 | 100298-0002

13

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   debt secured by liens on property of the estate that are equal or senior to existing liens. The

2   remaining constituencies in this case (and this Court) are familiar with these rights conferred by

3   the Code.

4   • Similarly, Thermo Grand complains that postpetition advances to the Trustee

5   "expressly exclude[] any matter adverse to the Bank and the prosecution of any claims or causes

6   of action against third parties." Opp., p. 4, lns 11-13. But these sorts of limitations on postpetition

7   financing are not considered extraordinary or unusual under this Court's and other jurisdictions'

8   guidelines governing postpetition financing. See, e.g., LBR 4001-2. Notably, the postpetition

9   credit agreement negotiated amongst Bank of America and the Trustee, and approved by this

10  Court does not seek waivers of rights under Bankruptcy Code section 503(c) to surcharge Bank of

11  America's collateral; does not waive rights to bring estate causes of action; and does not seek to

12  encumber estate causes of action with postpetition liens. See Motion, Ex. 1, Bates Stamp 146, §

13  11. Bank of America negotiated hard in this case, within the rights conferred by the Bankruptcy

14  Code. Thermo Grand seeks powers beyond those legitimately available to it.

15  • Thermo Grand goes so far as to assert the chapter 7 filing and the Motion are an

16  effort to use the bankruptcy process as an end-run around the Brockman Lease's *ipso facto* clause,

17  which provides that a bankruptcy filing will invalidate the lease. Opp., p. 2, lns 21-24. This is

18  nonsensical – as an *ipso facto* clause only comes into effect upon a bankruptcy filing, and is

19  nullified by that same action. See 11 U.S.C. § 365(e)(1)(B).

20  • Finally, all of the cases cited by Thermo Grand on page 3, lines 14-24 of its

21  Opposition are inapposite. In re Cardi Ventures, Inc., 59 B.R. 18, 22-23 (Bankr. S.D.N.Y 1985),

22  In re S. Cal. Sound Sys., Inc., 69 B.R. 893, 900 (Bankr. S.D. Cal. 1987), and In re Liberate Techs.,

23  314 B.R. 206, 217 (Bankr. N.D. Cal. 2004), dealt with whether a petition should be dismissed

24  under Bankruptcy Code section 1112(b), not the propriety of assuming and assigning a lease

25  section 365 (and inflammatory language aside, Thermo Grand has not brought any motion for

26  dismissal here). Similarly, In re Waldron, 785 F.2d 936, 940-941 (11th Cir. 1986) and In re

27  Sammons, 210 B.R. 197, 199 (Bankr. M.D. Fla. 1997) concern bad faith filings in consumer

28  debtor cases, not the standards for assumption and assignment under section 365.

634317.5 | 100298-0002

14

**B.** **More Than Adequate Assurance Of Future Performance Exists To Grant The Relief Requested In The Motion**

The Opposition complains "the Trustee has made no showing" regarding adequate assurance of future performance, as required under Bankruptcy Code section 365(f)(2)(B). Opp., p. 5, ln 17. This is incorrect. The Motion includes a declaration by David Kegaries, a Senior Vice President with Bank of America, stating that he is managing processes under which Bank of America will use an existing affiliate or capitalize a new entity to receive Bank of America's rights under the loan documents and deed of trust with Debtor; to foreclose on Debtor; to expressly assume all of the lessee's rights and duties under the Parking Lot Lease; and to establish an owners' association for further assignment of those rights and duties. This is precisely the bargain struck six years ago between Thermo Grand and the Debtor.

In addition to assurances previously submitted with the Trustee's Motion, Bank of America has hired Robert Stenson, an attorney and consultant in the areas of land use and real estate, to manage the process of forming and certifying a condominium owners' association that will be the eventual recipient of the rights and obligations under the Parking Lot Lease. Stenson has developed a critical path timeline and benchmarks relating to the creation of conditions, covenants, and restrictions governing the future owners' association and the formation of that association. See Stenson Decl. ¶ 5-8. Bank of America committed that, upon assumption and assignment of the Brockman Lease (and other steps related to foreclosure of the property by Bank of America's nominee), it will pay fees owing to such professionals.[5]

Assumption and assignment of the lease offers the same assurance that Thermo Grand currently holds, with the exception that, in place of a bankrupt, chapter 7 developer standing behind the lease and its obligations, those obligations will be assigned to an affiliate or another nominee of Bank of America, N.A., one of the largest lending institutions in the world, for

---

[5] A supplemental Kegaries declaration will be filed at or before the time of the hearing, updating parties-in-interest of the status of Bank of America's official approval of the necessary transactions.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

eventual assignment to an owners' association.

**C. The Parking Lot Lease Continues In Effect, And Thermo Grand Must Abide By The Bargain It Struck**

    **1. Thermo Grand Confuses Two Separate Lease Agreements -- No Termination Has Been Effective As To The Brockman Lease**

As described above, Thermo Grand's Opposition confuses two separate leases: the Brockman Lease is a separate lease apart from the Central Parking Master Lease. Moreover, but Thermo Grand confuses two separate lawsuits. First, on October 12, 2005, Thermo Grand commenced an unlawful detainer suit against Central Parking. That suit did not name or include the Debtor, and it did not mention or reference the Brockton Lease, despite months of litigation over motions for summary judgment, motions for reconsideration, and trial.

Second, a year later, on October 19, 2006, Thermo Grand brought an unlawful detainer suit directly against the Debtor. That suit incorrectly attempted to the name Debtor, which is Brockman Building Lofts, LLC, as "The Brockman Building LLC." Thermo Grand's complaint describes the supposedly offending tenancy as a "tenancy at will." As in the previous lawsuit, Thermo Grand's complaint makes no reference to the Brockman Lease, which had been in effect since December 2003 (just under three years prior to filing this suit). Apparently, Thermo Grand did not believe the offending use breached or related to the Brockman Lease, or that it rose to the level sufficient to correctly name the lease as a "lease agreement" and attach it to the complaint, as it was required to do. At any rate, that action was not pursued.

    **2. No Breach Occurred According To The Terms Of The Parking Lot Lease**

Even assuming any acts by the parties were effective against the Brockman Lease, no such actions amounted to a breach. First, the lease expressly provides that the "use restrictions" of which Thermo Grand complains are to come into effect upon the stated triggering events: formation of an owners' association. Brockman Lease, § 1.2(a) ("***Lessee shall assign its rights under this Agreement to an owners association*** which will be established pursuant to applicable law in conjunction with the Project, ***upon the express condition that the Premises shall be included in the common area of the Project and be used exclusively for private, non-public parking of***

*motor vehicles* by purchasers and owners.").

Moreover, the Brockman Lease expressly contemplates redeveloping the Brockman Building, including uses incidental to such redevelopment, like placing construction staging materials in the Brockman Parking Area. The language of the Brockman Lease supports this result, stating: "*Lessee intends to redevelop the Brockman Parcel for approximately eighty-eight (88) live/work condominium units (the "Project")*. Brockman Lease, § 1.2(a). Thermo Grand's assertion that the construction staging use is a material breach of a lease that specifically contemplates redevelopment and construction of a downtown loft building strains the language of the lease. Section 4.1 of the Brockman Lease further supports this construction, stating that the Debtor shall use and occupy the Brockman Parking Area "in accordance with § 1.2(a), above, and for purposes ordinarily and customarily incidental thereto." Brockman Lease, § 4.1.

### 3. Thermo Grand's Own Actions Demonstrate No Breach Occurred

Thermo Grand's ongoing post-contracting actions demonstrate it did not deem the Brockman Lease to be in breach, in default, terminated or otherwise affected. Although Thermo Grand brought suit in late 2006 to remedy the Debtor's supposedly offending uses of the property, Thermo Grand never mentioned the Brockman Lease in its demand letters or pleadings in those actions. Indeed, the email attached to Thermo Grand's Opposition from Rochman (counsel for Thermo Grand) to Rubin Turner (real estate counsel for the Debtor), which does not mention the Brockman Lease or that the Debtor's offending uses amount to any breach of the Brockman Lease. See Opp., Ex. D.

Rochman was aware of the Brockman Lease. Several months prior to the letter, on May 17, 2006, Rochman wrote to Turner regarding a "Memorandum of Understanding" relating to the parties' recording of Brockman Lease.[6] ("As we discussed earlier today, enclosed please find a notarized Memorandum of the Parking Lease and a redline reflecting changes from the original memorandum that you proposed."). Two months prior to that letter, Rochman wrote to Turner,

---

[6] A copy of the letter is attached hereto as Exhibit 10. Bank of America will submit an authenticating declaration before the hearing on the Motion.

confirming the parties would work in good faith to modify and amend the lease to permit the Debtor to assign or encumber its rights under the lease . Gordon Decl. ¶ 3; Ex. 9 (Letter from Astani dated February 7, 2006 to Turner). Through all of these communications, Thermo Grand's counsel never raised the fact that it considered the Brockman Lease to be in breach, in default, or affected in any way by the lawsuits underway. Accordingly, the Brockman Lease was never breached.

**4.** **Even In The Event Of A Breach, The Brockman Lease Is Not Terminated And Continues In Effect**

Even assuming a breach of the Parking Lot Lease between Thermo Grand and the Debtor took place, Thermo Grand's Opposition still fails because it misstates applicable law. Thermo Grand asserts (without citation or support) that "the provisions of the Parking Lot Lease are clear – violation of the use restriction resulted in *immediate* termination of the Lease." Opp., p. 8, lns 13-15 (emphasis added). This is inaccurate. Lease forfeiture clauses are not self-executing. See Mossi v. Fairbank, 19 Cal.App. 355, 356 (1912); Salton Community Servs. Dist. v. Southard, 256 Cal.App.2d 526, 533 (1967); Igauye v. Howard, 114 Cal.App.2d 122 (1952); Cal.Jur.3d, Landlord And Tenant, § 305, p. 438 (West 2008) ("Hence, the right to declare a forfeiture for the lessee's default…can be exercised only after the giving of notice to the lessee…").

Additionally, Thermo Grand never provided the Debtor with notice that it elected to terminate the Brockman Lease. None of the correspondence Thermo Grand sent the Debtor mentioned termination of the Brockman Lease. Moreover, the complaint in the Brockman Litigation incorporated the legal description for the Central Parking Master Lease, not the legal description for the Brockman Lease. Further, around May 2007 when Bank of America's predecessor-in-interest funded the loan, Thermo Grand did not indicate that the Debtor breached the Brockman Lease. Thermo Grand has improperly sat on its hands. Its failure to assert these rights for years and through previous litigation is suspect, at best, and mandates against forfeiture of the lease. Kern Sunset Oil Co. v. Good roads Oil Co., 214 Cal. 435, 440 (1940) (lessor may waive right to obtain forfeiture and retake possession of the property, either expressly or by conduct); Strom v. Union Oil Co., 88 Cal.App.2d 78, 81 (1948) (same); Schnittger v. Rose, 139

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   Cal. 656, 661-62 (1903) (same).

2        Even assuming for the sake of argument that Brockman Lease terminated prepetition either

3   automatically without notice or as a result of some sort of actions taken by Thermo Grand (and it

4   most certainly did not), this Court may appropriately undo any such forfeiture.  California Civil

5   Code §1179 affords relief from forfeiture to tenants, subtenants, and other parties, notwithstanding

6   an unlawful detainer proceeding.  See Cal. C. Civ. P. § 1179; Hignell v. Gebala, 90 Cal.App.2d

7   61, 67-70 (1949); Boston Props. v. Pirelli Tire Corp., 134 Cal.App.3d 985, 995 (1982).  This right

8   vests in the estate upon the commencement of a bankruptcy case by lessee-debtors, as is the case

9   here.  Wilson v. Bill Barry Enters., Inc., 822 F.2d  859, 861 (9th Cir. 1987).  Even where a lease

10  terminated prepetition, a trustee is entitled to seek reversal of the forfeiture.  In re Windmill

11  Farms, Inc., 841 F.2d 1467, 1471-72 (9th Cir. 1988).  In the unlikely event the Court finds that the

12  lease was terminated prepetition, Bank of America reserves its right to petition the Court to have

13  the lease reinstated pursuant to § 1179.

14  **D.     The Motion Appropriately Provides For The Curing Of Any Defaults.**

15       Finally, Thermo Grand complains in a five-line section that "there have been numerous

16  defaults" under the Parking Lot Lease, and that the Trustee's Motion "does not propose" to cure

17  such defaults in accordance with Bankruptcy Code section 365(b)(1)(A).  Opp., p. 8, lns 17-21.

18  Of course, the Opposition does not list what defaults exist, if any, and instead directs the reader to

19  the accompanying Rochman declaration.  The Rochman declaration describes the purportedly

20  offending uses of the property as a construction staging area in 2005 and 2006, the unlawful

21  detainer suits brought by Thermo Grand in those same years, and the lock-out of the property in

22  December 2006.  The Rochman declaration does not indicate what damages exist to be cured

23  under the lease.

24

25

26

27

28

634317.5 | 100298-0002

19

## CONCLUSION

**WHEREFORE**, Bank respectfully requests that the Court deny Thermo Grand's Opposition and enter an Order granting the Trustee's Motion.

DATED: October 6, 2009

FRANDZEL ROBINS BLOOM & CSATO, L.C.
KENNETH N. RUSSAK
LAINE MERVIS

By: /S/ KENNETH N. RUSSAK
KENNETH N. RUSSAK
Attorneys for Bank of America, N.A.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000